20-1494-cv
*Yang, et al. v. Kosinski, et al.*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2019

No. 20-1494-cv

ANDREW YANG, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED; JONATHAN HERZOG, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED; HELLEN SUH,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED;
BRIAN VOGEL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED; SHLOMO SMALL, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED; ALISON HWANG, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED; KRISTEN MEDEIROS,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED;
ROGER GREEN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,
*Plaintiffs-Appellees*,

JAY BELLANCA, TRACI STRICKLAND, EMILY ADAMS, NESTOR MEDINA,
SIMRAN NANDA, KATHRYN LEVY, JOSHUA SAUBERMAN, CARI
GARDNER, STEPHEN CARPINETA, NANCY DEDELVA, TING BARROW,
PENNY MINTZ, GEORGE ALBRO,
*Intervenors-Plaintiffs-Appellees*,

v.

PETER S. KOSINSKI, CO-CHAIR AND COMMISSIONER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITIES AT THE NYS BOE; TODD D. VALENTINE, CO-EXECUTIVE DIRECTOR, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITIES AT THE NYS BOE; ROBERT A. BREHM, CO-EXECUTIVE DIRECTOR, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITIES AT THE NYS BOE, *Defendants-Appellants*,

ANDREW SPANO, COMMISSIONER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITIES AT THE NYS BOE, *Intervenor-Defendant-Appellant*,

NEW YORK STATE BOARD OF ELECTIONS; DOUGLAS A. KELLNER, CO-CHAIR AND COMMISSIONER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITIES AT THE NYS BOE, *ADR Providers-Intervenors-Defendants-Appellants*,

ANDREW CUOMO, AS GOVERNOR OF THE STATE OF NEW YORK, *Defendant*.

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: MAY 15, 2020
DECIDED: JUNE 1, 2020

Before: KEARSE, JACOBS, AND CABRANES, *Circuit Judges*.

Defendants-Appellants the New York State Board of Elections and its officials (jointly, the "Board") appeal from an order of preliminary injunction entered in the United States District Court for the Southern District of New York (Analisa Torres, *Judge*) in favor of Democratic presidential candidate Andrew Yang and candidates for delegate seats who, if elected, would be pledged to Yang and fellow Democratic candidate, Senator Bernie Sanders. Yang, his delegates, and the Sanders delegates have challenged the Board's decision to remove all qualified candidates from the ballot, with the exception of former Vice President Joseph Biden, and cancel the Democratic presidential primary. Without the presidential primary, the candidates for delegates may not have an opportunity to participate in the proceedings of the Democratic National Convention.

The question presented in this case is whether Yang, his delegates, and the Sanders delegates have demonstrated an entitlement to preliminary injunctive relief that reverses the effects of the Board's decision by requiring Yang and Sanders to be reinstated to the ballot, and the Democratic presidential primary to be conducted along with the other primary elections set for June 23, 2020.

On review, we conclude, as the District Court did, that preliminary injunctive relief is warranted in the circumstances presented and, therefore, we **AFFIRM** the District Court's carefully tailored order of preliminary injunction.

———————

3

JEFFREY M. KURZON, Kurzon Kohen LLP, New York, NY, *for Plaintiffs-Appellees*.

J. REMY GREEN (Elena L. Cohen, Jonathan Wallace, *on the brief*), Cohen & Green P.L.L.C., Ridgewood, NY; and ARTHUR Z. SCHWARTZ, Advocates for Justice, New York, NY, *for Intervenors-Plaintiffs-Appellees*.

JUDITH N. VALE, Senior Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Steven C. Wu, Deputy Solicitor General, and Jennifer L. Clark, Assistant Solicitor General, *on the brief*), *for* Letitia James, Attorney General, State of New York, New York, NY, *for Defendants-Appellants*.

Malcolm Seymour, David R. West, Foster Garvey, P.C., New York, NY, *for Amici Curiae Senator Bernie Sanders and Bernie 2020 Inc. in Support of Appellees*.

Ezra Ishmael Young, Law Office of Ezra Young, Brooklyn, NY, *for Amici Curiae New York State Voters in Support of Appellees*.

Rob Rickner, Rickner PLLC, New York, NY, *for Amici Curiae Medical Professionals in Support of Appellees*.

4

Walter H. Hackett, III, Law Office of Walter Hackett, Walnut, CA, *for Amici Curiae Heather Key, et al. in Support of Appellees*.

---

JOSÉ A. CABRANES, *Circuit Judge*:

On April 27, 2020, New York became the only State or Territory in the United States to cancel its 2020 Democratic presidential primary. Specifically, on that day, two Democratic commissioners of the New York State Board of Elections (the "Board") removed the names of ten Democratic presidential candidates who had qualified to appear on the ballot, but had publicly announced that they were suspending their campaigns and/or no longer seeking the party nomination for the office of President of the United States. By virtue of that decision, only former Vice President Joseph Biden, the now-presumptive Democratic nominee, remained on the ballot. The Democratic presidential primary, described by the Board as nothing more than a "beauty contest," was thus canceled.[1] The stated reason for this action: the current coronavirus pandemic ("COVID-19"). According to the Board, the cancellation of the Democratic presidential primary would further the State's interests in minimizing social contacts to reduce the spread of the virus and in focusing its limited resources on the management of other contested primary elections.

---

[1] Joint App'x at 118.

Some Democratic presidential candidates were not pleased with the Board's decision. Several candidates had already chosen to "suspend," rather than formally terminate, their campaigns. They claimed to have done so with the understanding that, among other things, they would remain on the primary ballot in the hopes of electing delegates to attend the Democratic National Convention. The candidates' decision arguably was predicated on the longstanding and well-understood notion that presidential candidates and their elected delegates play an important role at national party conventions, even when there is a presumptive presidential nominee.

Dissatisfied with the Board's decision, Andrew Yang—a businessman, a New York registered voter, and a Democratic presidential candidate who had suspended his campaign for President—and several of his pledged delegates, sued the Board. Yang and his delegates (jointly, "Plaintiffs") challenged the Board's decision, alleging that the removal of their names from the ballot and the ensuing cancellation of the Democratic presidential primary violated their free speech and associational rights under the First and Fourteenth Amendments to the Constitution.[2]

---

[2] The Free Speech, Assembly, and Petition Clauses of the First Amendment provide that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. The Due Process Clause of the Fourteenth Amendment provides in relevant part that "[n]o State shall . . . deprive any person of . . . liberty . . . without due process of law." U.S. CONST. amend. XIV, § 1. The Supreme Court has made clear that the protections afforded by the First Amendment, including the principles of freedom of speech and association, are "an

Joined by a group of intervenors-delegates pledged to another presidential candidate, Senator Bernie Sanders ("Sanders delegates"), Plaintiffs sought a temporary restraining order and a preliminary injunction requiring that the names of all duly qualified candidates be restored to the ballot and the presidential primary be held as scheduled.

On May 5, 2020, the United States District Court for the Southern District of New York (Analisa Torres, *Judge*) granted the application for emergency injunctive relief and ordered the Board "to reinstate to the Democratic primary ballot those presidential and delegate candidates who were duly qualified as of April 26, 2020, and to hold the primary election on June 23, 2020."[3] The Board now appeals from the order granting the application for preliminary injunction.

On review, we conclude, substantially for the reasons stated in the District Court's careful and well-reasoned decision, that Plaintiffs and the Sanders delegates have adequately established their entitlement to preliminary injunctive relief on the basis that the Board's April 27 decision unduly burdened their rights of free speech and association.

---

inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986) (quoting *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460 (1958)).

[3] *Yang v. Kellner*, No. 20-cv-3325 (AT), ---F. Supp. 3d---, 2020 WL 2129597, at *14 (S.D.N.Y. May 5, 2020).

Accordingly, the May 5, 2020 decision and order of the District Court is **AFFIRMED**.[4]

## I. BACKGROUND

### A. The Facts[5]

The Democratic presidential primary in New York is a head-to-head electoral contest between the various presidential candidates who are competing for pledged delegates to the Democratic National Convention and seeking the Democratic nomination. The votes cast in the primary for each candidate are tallied and then provided to the New York Democratic Party so that it can determine the number of "elected" or "pledged" delegates that will represent each candidate at the Democratic National Convention.[6] According to New York's

---

[4] In the interest of time and efficiency, on May 19, 2020, this Court affirmed the District Court's decision and order by summary order and indicated that our opinion would follow. *See Yang v. Kosinski*, No. 20-1494-cv, ---F. App'x---, 2020 WL 2530191, at *1 (2d Cir. May 19, 2020). This is the promised opinion.

[5] We draw the facts from the District Court's recitation of the allegations in the pleadings and the undisputed record before us. *See Yang*, 2020 WL 2129597, at *1–3. The record in this case consists primarily of the various materials presented to the District Court relating to the application for preliminary injunction, as well as the transcript of the telephonic hearing before the District Court.

[6] The majority of the delegates at the Democratic National Convention are elected delegates, who are "pledged" to a presidential candidate and are thus "required to vote for a particular candidate at the Convention based on the result of their state's (or territory's) primary election, caucus, or convention." *Id.* at *1 n.1. (internal quotation marks and citation omitted). There are also some non-elected, "unpledged" delegates, formally known as "automatic delegates" (and commonly referred to as "superdelegates"), who may vote for the candidate of their choice.

delegate-selection plan, "a candidate for the presidency may send delegates to the Convention if he or she receives at least 15 percent of the vote in a congressional district, and 15 percent of the vote statewide."[7]

The New York Democratic presidential primary was originally set for April 28, 2020. Eleven different candidates had qualified to appear on the ballot. Between February and April, all but Vice President Biden "publicly announced that they are no longer seeking the nomination for the office of president of the United States, or that they are terminating or suspending their campaign."[8] Among those

---

*See id.* (internal quotation marks and citation omitted). Notably, under the current procedural rules and the "call for the convention" of the National Democratic Party, the voting power of the so-called "superdelegates" is more limited, as they cannot vote, for example, on the first nominating ballot at the convention if no candidate wins a majority of the delegates by the end of the primary season. *See* CALL FOR THE 2020 DEMOCRATIC NATIONAL CONVENTION: ISSUED BY THE DEMOCRATIC PARTY OF THE UNITED STATES art. IX.C.7 (adopted August 25, 2018), *available at* https://democrats.org/wp-content/uploads/2019/02/2020-Call-for-Convention-WITH-Attachments-2.26.19.pdf (last visited May 25, 2020). Only if the vote by the pledged delegates is insufficient to decide the nomination after the first ballot, can the superdelegates cast their vote at a contested convention to break any putative stalemate. *See id.*; *see also* Joint App'x at 300.

The Yang and Sanders delegates would all be "pledged" delegates if their candidates receive the necessary votes under the terms of the delegate-selection plan for New York.

[7] *Yang*, 2020 WL 2129597, at \*1 (describing the requirements for a presidential candidate to collect elected, pledged delegates); *see also* Joint App'x at 183, 185.

[8] Joint App'x at 124.

9

candidates are Yang, who suspended his campaign on February 11, and Sanders, who followed suit on April 8. Despite "suspending" their campaigns and subsequently endorsing Biden as the Democratic presumptive nominee, Yang and Sanders publicly announced that they intended to remain on the ballot in all remaining primaries to collect delegates for the convention.

But the rules of the contest were changed as a result of the COVID-19 pandemic. On March 28, 2020, New York Governor Andrew Cuomo issued an executive order directing the presidential primary to be "postponed and rescheduled for June 23, 2020."[9] Then, on April 3, Governor Cuomo signed an omnibus budget bill that altered the various procedures for holding presidential primaries in New York and selecting elected delegates to the Democratic National Convention.

Newly enacted New York Election Law § 2-122-a(13) authorizes the Board to "omit" those presidential candidates "from the [primary] ballot" if the candidates: (1) "publicly announce[ ] that they are no longer seeking the nomination"; (2) "publicly announce[ ] that they are terminating or suspending their campaign"; or (3) "send[ ] a letter to the state board of elections indicating that they no longer wish to appear on the ballot."[10] If a candidate were omitted from the ballot as

---

[9] N.Y. Exec. Order 202.12; *see also* Joint App'x at 56, 112.

[10] N.Y. ELEC. LAW § 2-122-a(13). The statute further provides that "for any candidate of a major political party, such determination shall be solely made by the commissioners of the state board of elections who have been appointed on the

10

a result of one of these three circumstances, the statute further provides that the "candidates for delegates and/or alternate delegates who are pledged" to the omitted presidential primary candidate also be removed from the ballot.[11]

On April 20, 2020, more than two weeks after the omnibus bill became law, the two Democratic commissioners of the Board of Elections announced their intention to hold a vote on April 22—later postponed to April 27—on whether to exercise their new authority.[12] Yang and Sanders vigorously objected to the proposed change; "thousands of emails" to the Board from displeased voters followed.[13] Sanders, for example, submitted a letter through his attorney explaining that he "announced the limited suspension of his presidential campaign, [while] emphasizing that he intended to remain on the ballot in upcoming primaries, gather delegates, and attend the Democratic National Convention, with an eye to influencing the party's platform."[14]

---

recommendation of such political party or the legislative leaders of such political party." *Id.*

[11] *Id.* § 2-122-a(14).

[12] *See* Joint App'x at 113 (declaration of the Board's Co-Executive Director Robert Brehm reciting, among other things, the Board's actions following the enactment of the law).

[13] *Id.* at 114 (same).

[14] *Id.* at 99–100 (Sanders Letter to the Board).

The objections fell on deaf ears. On April 27, the Democratic commissioners adopted a resolution (the "April 27 Resolution") removing all of the qualified candidates and their pledged delegates from the ballot, with the exception of Vice President Biden and his pledged delegates. The two commissioners did so on the basis of "public declarations made by the relevant presidential candidates" that they had suspended their presidential campaigns or were no longer seeking the nomination.[15] With Biden left as the only presidential candidate on the ballot, the Democratic commissioners effectively canceled the presidential primary pursuant to the longstanding New York statute that provides that when there is only one candidate on the ballot, the sole candidate "shall be deemed nominated or elected . . . without balloting."[16]

## B. Procedural History

On April 28, 2020, Plaintiffs filed suit challenging the April 27 Resolution as unconstitutional and seeking, among other things, a preliminary injunction to reverse the Board's decision to remove their names from the ballot.[17] The Sanders delegates intervened in the suit

---

[15] *Id*. at 125 (April 27 Resolution).

[16] N.Y. ELEC. LAW § 6-160(2).

[17] In addition to Plaintiffs' claims for injunctive relief arising under the U.S. Constitution, Plaintiffs alleged that the April 27 Resolution violates their rights under various provisions of the Constitution of the State of New York. *See* Joint App'x at 65–70. Plaintiffs also sought actual or statutory damages against the Board and the Board officials in both their official and individual capacities. *See id.* at 73. We do not consider those claims here. *See Yang*, 2020 WL 2530191, at *6 ("[F]or the

with leave of the District Court, filing their own complaint, and joining the Plaintiffs' request for emergency equitable relief.

On May 4, the District Court held telephonic argument on the application for a preliminary injunction.[18] A day later, on May 5, the District Court issued its Opinion and Order granting the application. The instant appeal followed.

## II. DISCUSSION

On appeal, the Board argues that the District Court erred in issuing a preliminary injunction reversing the effects of the April 27 Resolution. Specifically, the Board contends that it has "compelling interests in protecting health, safety, and the efficient administration of elections during the COVID-19 pandemic."[19] The Board further argues that the April 27 Resolution meaningfully advances those

---

purposes of resolving the request for a preliminary injunction, the Court addresses only prospective injunctive relief against the [Board] Officials in their official capacity brought under the U.S. Constitution.").

[18] Although the District Court "held a telephonic hearing on the request for a preliminary injunction," that hearing did not involve any "live" testimony. *Id.* at *3. As the District Court explained, an "evidentiary hearing" was not required because the "entitlement to relief is clear from the undisputed record" presented by the parties. *Id* at n.2. (collecting cases).

[19] Appellants' Br. at 17.

13

interests and "does not necessarily foreclose" Plaintiffs and the Sanders delegates "from pursuing [their associational] interest[s]."[20]

Although the interests set forth by the Board are certainly important, its argument sweeps too broadly. The Board overstates the strength of its justifications for enacting the April 27 Resolution in furtherance of its interests. In doing so, it unduly encroaches on the competing constitutional interests of Plaintiffs and the Sanders delegates.[21]

## A. Standard of Review and Legal Standard

We review *de novo* the District Court's legal conclusions in deciding to grant a motion for a preliminary injunction,[22] but review its ultimate decision to issue the injunction for "abuse of discretion."[23]

---

[20] *Id.* at 19.

[21] We note that the District Court's holding on Article III standing was not challenged on appeal. Nevertheless, to satisfy our independent obligation to determine our subject-matter jurisdiction over the case, we have examined *sua sponte* the question of Article III standing and concluded that Plaintiffs and the Sanders delegates have standing to challenge the Board's April 27 Resolution.

[22] *See Am. Express Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998).

[23] *See Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.,* 764 F.3d 210, 214 (2d Cir. 2014). "A district court has 'abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence,' *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405 . . . (1990), or rendered a decision that 'cannot be located within the range of permissible decisions,' *Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir. 2001)." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (alteration omitted).

Ordinarily, to obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to "demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction."[24] The movant also must show that "the balance of equities tips in his [or her] favor."[25]

But where the movant is seeking to modify the status quo by virtue of a "*mandatory* preliminary injunction" (as opposed to seeking a "*prohibitory* preliminary injunction" to maintain the status quo),[26] or where the injunction being sought "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits,"[27] the movant must also: (1) make a "strong showing" of irreparable harm,[28] and (2)

---

[24] *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (citing *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011)).

[25] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[26] *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (emphasis in original).

[27] *New York ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citation omitted).

[28] *Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir. 1981).

15

demonstrate a "clear or substantial likelihood of success on the merits."[29]

We need not choose between these two standards of review because we are confident that Plaintiffs and the Sanders delegates would prevail regardless of the standard we apply. Like the District Court, we assume, for the sake of argument only, that the more rigorous standard applies here.[30]

## B. Analysis of the Injunction Factors

The Board argues that the District Court "erred in concluding that" Plaintiffs and the Sanders delegates "are likely to succeed on the merits of their claims, and . . . that the balance of equities and public interest support[s] the preliminary injunction."[31] Notably, the Board does not appear to challenge, and therefore concedes, the District Court's finding that Plaintiffs and the Sanders delegates have established "the single most important prerequisite for the issuance of a preliminary injunction"[32]: that they would be irreparably injured in the absence of preliminary injunctive relief.

---

[29] *Mastrovincenzo*, 435 F.3d at 89 (internal quotation marks and citation omitted).

[30] *See Yang*, 2020 WL 2530191, at *6.

[31] Appellants' Br. at 24.

[32] *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted).

Indeed, the Board's brief on appeal does not bother to discuss the irreparable-harm prong—for good reason.[33] Beyond alleging the violation of their constitutional rights, there can be no question that Plaintiffs and the Sanders delegates have demonstrated that, without the requested injunctive relief reversing the effects of the April 27 Resolution, they could neither compete nor participate in New York's Democratic presidential primary.[34] Accordingly, Plaintiffs and the Sanders delegates have made a strong showing of irreparable harm.[35]

With that in mind, we now address the injunction factors that are contested by the parties.

### 1. Clear or Substantial Likelihood of Success on the Merits.

---

[33] Although the Board states in passing that "*each* of the preliminary-injunction factors weighs against ordering the Board to conduct an uncontested presidential primary during the COVID-19 pandemic," Appellants' Br. at 23 (emphasis added), there is no mention, let alone a substantive discussion, of the irreparable-harm prong of the standard for injunctive relief. Rather, the Board focuses exclusively on the merits of the claim and the balancing of the equities. *See id*. at 24–37; *see also generally* Appellants' Reply Br. at 2–21. The only reference to "irreparable harm" relates to the alleged harms to the Board's interests, *see* Appellants' Br. at 28—a reference that has no bearing on the irreparable-harm prong that the *movant* must establish.

[34] *See Faiveley*, 559 F.3d at 118 (requiring a showing that, "absent a preliminary injunction," the movants "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm" (internal quotation marks and citation omitted)).

[35] *See ante* note 24.

To dispose of the Board's appeal at this stage, we do not need to decide whether § 2-122-a(13) is constitutional on its face. As the District Court explained, it may well be that the statute "reflect[s] reasonable policy objectives in the abstract."[36] And, as counsel for Plaintiffs explained at oral argument, the application of § 2-122-a(13) in 2024 may raise different issues that are not implicated in the circumstances presented at this stage of the case. Those questions, if ever presented, must be addressed at a later date.

Rather, here, we are called upon to consider the constitutionality of § 2-122-a(13) as applied by the Board to Plaintiffs and the Sanders delegates through the adoption of the April 27 Resolution. There is no "litmus-paper test" to answer that question.[37] Instead, we conduct a two-step inquiry that applies to election-related restrictions.

First, we ascertain the extent to which the challenged restriction burdens the exercise of the speech and associational rights at stake. The restriction could qualify as "reasonable [and] nondiscriminatory" or as "severe."[38] Once we have resolved this first question, we proceed to the second step, in which we apply one or another pertinent legal standard to the restriction.

---

[36] *Yang*, 2020 WL 2129597, at *9.

[37] *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (internal quotation marks omitted).

[38] *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

If the restriction is "reasonable [and] nondiscriminatory," we apply the standard that has come to be known as the *Anderson-Burdick* balancing test: we "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate," and "then . . . identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule."[39] "In passing judgment" under this more flexible standard, we must "determine [both] the legitimacy and strength of each of those interests" and "the extent to which those interests make it necessary to burden the plaintiff's rights."[40]

If the restriction is "severe," then we are required to apply the more familiar test of "strict scrutiny": whether the challenged restriction is "narrowly drawn to advance a state interest of compelling importance."[41] It follows then that the "rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged [restriction] burdens First and Fourteenth Amendment rights."[42]

It may be hard to imagine a more "severe" election-related restriction than the removal of ten out of eleven qualified candidates

---

[39] *Anderson*, 460 U.S. at 789.

[40] *Id.*

[41] *Burdick*, 504 U.S. at 434 (internal quotation marks omitted).

[42] *Id.*

from a ballot, resulting in the cancellation of the election. That said, in these circumstances, we need not decide whether the strict-scrutiny test applies here, since Plaintiffs and the Sanders delegates are clearly or substantially likely to prevail on the merits of their claim even under the more flexible and less exacting standard. As the District Court aptly observed, "the Court ultimately need not determine whether this burden was so severe that strict scrutiny is warranted, because even under the more lenient balancing test," the Board's "justifications cannot support their weighty imposition on Plaintiffs' and [the Sanders delegates'] right to free association."[43]

### i. The burden on the asserted constitutional rights.

The nature of the constitutional rights asserted by Plaintiffs and the Sanders delegates "is evident."[44] As discussed above, they wish to appear on the ballot of New York's Democratic presidential primary and they wish to vote in the primary election. That interest "to engage in association for the advancement of beliefs and ideas"[45] and "to cast their votes effectively"[46] falls squarely within the ambit of the protection afforded by the First Amendment. That interest is "an

---

[43] *See Yang*, 2020 WL 2129597, at *10.

[44] *Tashjian*, 479 U.S. at 214.

[45] *Id.* (quoting *NAACP*, 357 U.S. at 460).

[46] *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

20

inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment," which is applicable to the States.[47]

It is settled that "[t]he right to associate with the political party of one's choice is an integral part of this basic constitutional freedom [of association],"[48] which in turn "necessarily presupposes" the party's right to define its internal structure and "the freedom to identify the people who constitute the association."[49] Parties exercise that freedom in a number of ways, including through elections to choose their nominees for public office. And although States have a "broad power to regulate the time, place, and manner of [such] elections," they have a "'responsibility to observe the limits established by the First Amendment rights of the State's citizens.'"[50]

The State's power cannot be used, for example, to create barriers that unduly burden a person's right to participate in a state-mandated presidential primary.[51] Indeed, "[a]ny interference with the freedom of a party" to determine how it will choose its delegates "is

---

[47] *Tashjian*, 479 U.S. at 214 (quoting *NAACP*, 357 U.S. at 460); *see ante* note 2.

[48] *Id.* (quoting *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973)).

[49] *Id.* at 214–15 (quoting *Democratic Party of U. S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (1981)).

[50] *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 222, (1989) (quoting *Tashjian*, 479 U.S. at 217).

[51] *See N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 204 (2008) ("We have indeed acknowledged an individual's associational right to vote in a party primary without undue state-imposed impediment.").

21

simultaneously an interference with the freedom of its adherents."[52] The question thus becomes: what exactly is the burden imposed by the Board, in adopting by action of two of its members the April 27 Resolution, on the constitutional rights of Plaintiffs and the Sanders delegates?

**a.**

Yang wants an opportunity to compete for delegates. And so does Sanders, who filed an amicus brief before this Court in support of the claims of Plaintiffs and the Sanders delegates. By the same token, the Yang and Sanders delegates also want to compete for an opportunity to attend the Democratic National Convention. These are not trivial interests. Those familiar with the internal structure of the Democratic Party and the history of its National Convention will have no difficulty appreciating their significance.

At the Democratic National Convention, delegates have many important responsibilities, some with long-term consequences. In addition to participating in the selection of the presidential nominee, they vote on the procedural rules of the Convention; the National Democratic Party electoral platform; issues of party governance; and

---

[52] *Tashjian*, 479 U.S. at 215 (quoting *Democratic Party*, 450 U.S. at 122).

not insignificantly, the selection of the vice-presidential nominee.[53] Furthermore, the power of the elected delegates extends beyond the quadrennial national convention. The delegates of the National Convention remain "the highest authority [and governing body] of the Democratic Party" until new delegates are selected.[54] Accordingly, the programs and policies adopted at the Democratic National Convention will continue to influence state party rules or actions of the Democratic National Committee.[55]

---

[53] *See, e.g.*, *Rockefeller v. Powers*, 74 F.3d 1367, 1380 (2d Cir. 1995); *Yang,* 2020 WL 2129597, at *9 (collecting citations to the record); Joint App'x at 300, 305–06.

[54] THE CHARTER & THE BYLAWS OF THE DEMOCRATIC PARTY OF THE UNITED STATES ("CHARTER & BYLAWS"), Charter art. II, §§ 2, 4 and Bylaws art. I, § 1 (as amended August 25, 2018), *available at* https://democrats.org/wp-content/uploads/2018/10/DNC-Charter-Bylaws-8.25.18-with-Amendments.pdf (last visited May 22, 2020); *see also* Br. for *Amici Curiae* Senator Bernie Sanders and Bernie 2020 Inc. at 4–5 (describing the role of delegates and the National Convention under the Democratic Party's Charter & Bylaws) (citing, e.g., CHARTER & BYLAWS, Charter art. III, § 1; *id.*, art. IV, § 1; *id.*, art. V, § 1).

[55] The Democratic Party is familiar with how unsuccessful presidential candidates have influenced the party's governance and shaped the party's rules in a way that has transformed the internal structure and politics of the Democratic Party moving forward. For example, after an unsuccessful run to obtain the Democratic nomination for President in the midst of the tumultuous 1968 Democratic National Convention, Senator George McGovern led an effort to reform the Party's internal structure and nominating procedures. *See Democratic Party of U.S.*, 450 U.S. at 116–17. The effort concluded in the adoption of "guidelines to eliminate state party practices that limited the access of rank-and-file Democrats to the candidate selection procedures, as well as those that tended to dilute the influence of each Democrat who took advantage of expanded opportunities to participate"—which are commonly known as the "McGovern Rules," and which were formally "incorporated into the Call to the 1972 Convention, which set forth

The process for determining the number of pledged delegates per candidate is complex, but it is indisputable that, under the current rules of the National and New York Democratic Party, the *only* way for a candidate for delegate to compete for the opportunity to participate in the work of the Democratic National Convention is if the name of that delegate's presidential candidate appears on the ballot. Put another way: the Board's cancellation of the presidential primary has deprived Plaintiffs and the Sanders delegates not only of their right to cast a ballot in the presidential primary, but also of their right to seek an entitlement to attend the Democratic National Convention as delegates. This is a substantial burden on the rights of speech and association of Plaintiffs and the Sanders delegates.

As the District Court explained:

---

the formal requirements of the delegate selection and nominating processes for the Convention." *Id.* at 116–17 & nn. 15–16; *see also* Eli Segal, *Delegate Selection Standards: The Democratic Party's Experience*, 38 GEO. WASH. L. REV. 873, 880–881 (1970), *cited in Democratic Party of U.S.*, 450 U.S. at 116 n.15. *See generally* BYRON E. SHAFER, QUIET REVOLUTION: STRUGGLE FOR THE DEMOCRATIC PARTY & THE SHAPING OF POST-REFORM POLITICS (1983).

More recently, after an unsuccessful run for the Democratic presidential nomination in 2016, "Senator Sanders and his delegation actively participated in the Convention and its Committees, securing important reforms to the Democratic Party's platform, rules and bylaws," which included the promulgation of new rules that substantially limited the voting power assigned to the so-called "superdelegates" at the National Convention—rules that have been adopted in the "Call for the 2020 Convention." Br. for *Amici Curiae* Senator Bernie Sanders and Bernie 2020 Inc. at 1.

[T]he removal of presidential contenders from the primary ballot not only deprived those candidates of the chance to garner votes for the Democratic Party's nomination, but also deprived their pledged delegates of the opportunity to run for a position where they could influence the party platform, vote on party governance issues, pressure the eventual nominee on matters of personnel or policy, and react to unexpected developments at the Convention. And it deprived Democratic voters of the opportunity to elect delegates who could push their point of view in that forum.[56]

The character and magnitude of this burden becomes more apparent as we consider the circumstances in which the April 27 Resolution came into being. New York election law has long provided—since at least 1976—that uncontested elections can be resolved "without balloting."[57] It is not disputed that an election under New York law is "uncontested" if there is only one candidate on the ballot for a particular office—either because that candidate was the only one who qualified to be on the ballot, or because the other candidates who had qualified expressly asked to be removed through a notarized request sent to the Board.[58]

---

[56] *Yang*, 2020 WL 2129597, at *9.

[57] N.Y. ELEC. LAW § 6-160(2).

[58] Joint App'x at 183–84 (describing the qualifying requirements for a presidential primary to appear on the ballot and explaining that a qualified candidate "shall appear as such a Candidate on the Primary ballot throughout the State unless, that individual files a declination of candidacy with the State Board");

Therefore, absent "declination" or other circumstances not present here (*e.g.,* a challenge to the validity of the signatures submitted by the candidate), it had long been understood that once a candidate qualifies to participate in the primary, the candidate is entitled to appear on the ballot. It was based on this understanding that, for example, Yang suspended his campaign in February 2020.

When § 2-122-a(13) was enacted on April 3, 2020, to authorize the removal from the ballot of those candidates who had publicly announced that they were suspending their campaigns or no longer seeking the nomination, the State changed the longstanding rules governing the New York Democratic Party's primary process. It did so, notably, at the eleventh hour. As a result, when the Board exercised its newly enacted, discretionary authority under § 2-122-a(13) to adopt the April 27 Resolution, the Board "upended the candidates' settled expectation that they would stay on the ballot; after all, when Yang and [most of] the other contenders suspended their campaigns, there was no threat that doing so would bar them from competing for delegates."[59]

**b.**

---

*see also* Sanders Delegates' Br. at 39 ("Within New York's Election Law, it is all but impossible to get *off* the ballot, 'however reasonable [the reason for removal] might appear.'" (quoting *Matter of Biamonte v Savinetti*, 87 A.D.3d 950, 954 (2d Dept. 2011)).

[59] *Yang,* 2020 WL 2129597, at *9.

The Board argues that "both Yang and Senator Sanders had an opportunity to prevent the Board from removing their names from the ballot and thus to prevent the cancellation of the presidential primary."[60] The Board emphasizes the fact that "Sanders suspended his campaign [on April 8] *after* the Legislature enacted Election Law § 2-122-a(13), and [that] Yang could have reactivated his campaign before the Board issued its determination."[61] We are not persuaded.

As a threshold matter, nothing in the text of § 2-122-a(13) suggests that candidates who "reactivate" their campaigns may restore their eligibility to remain on the ballot. That omission is significant in light of the fact that § 2-122-a(13) was enacted as part of an omnibus budget bill—without much, if any, public discussion and without a traceable legislative history. In light of the text of the new statute and the absence of contemporaneous guidance accompanying its enactment, the Board's argument that the candidates "could have reactivated" their campaigns between April 3 and April 27 carries little weight.

Significantly, on April 20, when the two Democratic commissioners of the Board announced their intention to vote on whether to exercise their new authority under § 2-122-a(13), Yang and Sanders vigorously objected to the Board's proposal and made it clear to the Democratic commissioners that they wished to remain on the

---

[60] Appellants' Br. at 20.

[61] *Id.*

27

ballot. Indeed, Sanders, through his counsel, sent a detailed letter to the Board to that effect.[62] In the circumstances presented here, the Board's insistence on the candidates' formal reactivation of their campaign appears to put form over substance, as it should have been clear by April 27 that Yang and Sanders wished to remain on the ballot and compete for delegates. By removing candidates who qualified to be, and clearly intended to remain, on the ballot, the Board, through its two Democratic commissioners, effectively manufactured an "uncontested" election within the meaning of New York election law and thereby canceled the primary by operation of law.[63] It did so without apparent regard to the burden that its decision would impose on the Plaintiffs and the Sanders delegates under the existing delegate-selection plan.

### c.

The Board next argues that the April 27 Resolution does not preclude "the associational activity that" Plaintiffs and the Sanders delegates seek because the Democratic National Committee and the presidential candidates (specifically, Biden and Sanders) can "provide alternate means for selecting delegates to the convention."[64] Because the Democratic National Committee or the presidential candidates could in theory reach an agreement that renders the presidential delegate-selection primary unnecessary, we are invited to draw the

[62] *See* Joint App'x at 99–100.

[63] *See* N.Y. ELEC. LAW § 6-160(2).

[64] Appellants' Br. at 35.

28

conclusion that the Board's actions, as they currently stand, are constitutional.

We decline this invitation to "overlook an [alleged] unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired."[65] And we decline to reserve our judgment on a constitutional claim based on what *could* happen in an imagined universe, especially when that universe includes major third-party actors (*e.g.*, the Democratic National Committee and Vice President Biden) not present before us.

With this analysis in mind, we turn to the interests asserted by the Board to justify the burden that the April 27 Resolution placed on the constitutional rights of Plaintiffs and the Sanders delegates.

### *ii.    The justifications for the April 27 Resolution.*

The Board contends that the April 27 Resolution is justified to further the State's compelling interests in: (1) protecting the public from the health risks posed by COVID-19 by, for example, minimizing social contacts and interactions; and (2) utilizing the Board's limited resources to make sure that other (contested) elections can be conducted safely and efficiently during the current pandemic. We examine each justification in turn and consider whether they "make it

---

[65] *Cal. Democratic Party v. Jones*, 530 U.S. 567, 581 (2000).

29

necessary to burden the [constitutional] rights" of Plaintiffs and the Sanders delegates.[66]

As explained below, upon closer examination, the Board overstates the strength of its justifications in an effort to sustain the considerable limitations that it has placed on the constitutional rights asserted by Yang and the Sanders delegates.

**a.**

With respect to the first justification, the Board explains that approximately "eighteen of New York's sixty-two counties contain subdivisions, such as cities, towns, or election districts, that will not need to conduct any election at all absent the Democratic presidential primary," and that in approximately "seven of these counties" no election would need to be held.[67] According to the Board, "[n]ot holding an election in these counties, municipalities, and districts will significantly reduce the number of voters, poll sites, and poll workers who will have to be physically present, thereby decreasing the risk of the virus spreading in the community."[68]

This justification is overstated for at least two reasons. *First*, Governor Cuomo has authorized every voter in the State to request an absentee ballot and has ordered that absentee ballot applications be

---

[66] *Anderson*, 460 U.S. at 789.

[67] Appellants' Br. at 27 (citing Joint App'x at 118).

[68] *Id.*

mailed to *all* voters.[69] We agree with the District Court that, in light of these measures and the circumstances they are designed to address, "in-person turnout is likely to be dramatically lower, allowing the state to safely accommodate those voters who need to vote at a polling location."[70] Those who do choose to vote in person may cast their votes by practicing "social distancing," as recommended by the guidelines of the Centers for Disease Control and Prevention,[71] or through innovative methods, such as secure drop-off boxes (if available).[72]

*Second*, primaries for other races will be held on June 23 in the vast majority of counties in the State. Approximately, "90% or more of New York's Democratic Party electorate will be voting in other primaries" on June 23, "ranging from Congressional seats, State Senate and Assembly seats, State Democratic Committee, judgeships, and many other positions."[73] And the counties that will be conducting elections include "Kings, Queens, New York, Suffolk, Bronx, and Nassau Counties, each of which has a population exceeding one

---

[69] *See* Joint App'x at 286.

[70] *Yang*, 2020 WL 2129597, at *11.

[71] CTRS. FOR DISEASE CONTROL AND PREVENTION, *Recommendations for Election Polling Locations: Interim Guidance to Prevent Spread of Coronavirus Disease 2019 (COVID-19)* (updated March 27, 2020), *https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html* (last visited May 22, 2020).

[72] *Yang*, 2020 WL 2129597, at *11 n.4.

[73] Joint App'x at 288.

31

million,"[74] and each of which is among the counties of New York (and the country) most afflicted by the pandemic. These facts stand in stark contrast to those counties where no election would need to be conducted absent the Democratic presidential primary,[75] which, as counsel for the Board conceded at oral argument, are all located in upstate New York in areas that are not heavily populated. And, notwithstanding the fact that the pandemic has left the whole country at a standstill, as counsel for the Board also confirmed at oral argument, New York is the *only* State or Territory of the United States that has canceled the Democratic presidential primary.

**b.**

The second justification—the Board's assertedly limited resources—warrants little discussion. The Board explains that its limited resources will need "to be diverted from the task of preparing for and conducting the remaining contested primaries and elections on June 23" to conduct the presidential primary and potentially accommodate "a surge in absentee balloting."[76] This assertion is simply too conclusory and vague to support the cancellation of the presidential primary and, in any event, does not warrant the burden imposed on Plaintiffs and the Sanders delegates.

---

[74] *Yang*, 2020 WL 2129597, at *11.

[75] *See* Joint App'x at 118.

[76] Appellants' Br. at 30–31.

As the Supreme Court teaches, in a related context, "[e]ven assuming the factual accuracy of these contentions . . . the possibility of future increases in the cost of administering the election system is not a sufficient basis here for infringing [Plaintiffs' and the Sanders delegates'] First Amendment rights."[77] If limited resources need to be diverted from other elections or budgetary sources to conduct the presidential primary as scheduled, it is only because the Board effectively canceled the primary in the first instance, notwithstanding the numerous objections to the contrary. In these circumstances, the Board's cost-saving justification does little to advance its position.

## 2. The Balance of the Equities and the Public Interest

Under the last injunction factor, we must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,"[78] as well as "the public consequences in employing the extraordinary remedy of injunction."[79]

Our analysis of the competing interests under the *Anderson-Burdick* framework demonstrates that the balance of equities tips in favor of Plaintiffs and the Sanders delegates, and in favor of upholding the preliminary injunction entered by the District Court. It bears

---

[77] *Tashjian*, 479 U.S. at 218.

[78] *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

[79] *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

recalling that, under the current rules of the Democratic Party and its New York delegate-selection plan, a presidential primary *must* take place in order for the Yang and Sanders delegates to be able to participate in the deliberations of the Democratic National Convention. And in light of the importance of the right to political participation in a primary election and the pivotal role that delegates play within the structure of the Democratic Party, Plaintiffs and the Sanders delegates have shown that, absent injunctive relief, their First Amendment rights likely would be forever extinguished. That is surely a "significant" hardship that the Board has not adequately justified.[80]

We are mindful that the cost of the preliminary injunction on the Board may not be trivial. But as the District Court aptly stated, it is a cost that the State of New York chose to bear "when it assumed the responsibility of regulating and holding the [Democratic Party's] primary election," and that it was required "to shoulder . . . before the adoption of the April 27 Resolution."[81] We agree that the balance struck by the District Court between the various competing interests promotes, rather than undermines, the public interest.[82]

---

[80] *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *see also Yang*, 2020 WL 2129597, at *12 (collecting cases).

[81] *Yang*, 2020 WL 2129597, at *12.

[82] *See id.*

### III.   CONCLUSION

To summarize: we conclude that Plaintiffs and the Sanders delegates have: (1) made a strong showing of irreparable harm absent injunctive relief; (2) demonstrated a clear or substantial likelihood of success on the merits of their claims under the First and Fourteenth Amendments; and (3) demonstrated that the balance of the equities tips in their favor and that the public interest would be served adequately by the District Court's preliminary injunction. We hold that the District Court did not err or abuse its discretion in granting the application for a preliminary injunction, which was carefully tailored to secure the constitutional rights at stake and to afford the Board sufficient time and guidance to carry out its obligations to the electorate and to the general public.

The District Court's May 5, 2020 order entering a preliminary injunction is **AFFIRMED**.