*A.H. v. French*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2020

ARGUED: OCTOBER 13, 2020
DECIDED: JANUARY 15, 2021

No. 20-1772

A.H., by and through her parents and natural guardians, James
Hester and Darlene Hester, other James Hester, other Darlene
Hester; JAMES HESTER, individually; DARLENE HESTER,
individually; ROMAN CATHOLIC DIOCESE OF BURLINGTON,
VERMONT,
*Plaintiffs-Appellants*,

E.M., by and through her parents and natural guardians,
Christopher Messineo and Jill Messineo, other Christopher
Messineo, other Jill Messineo; CHRISTOPHER MESSINEO,
individually; JILL MESSINEO, individually; A.M., by and through
his parents and natural guardians, Christopher Messineo and Jill
Messineo, other Christopher Messineo, other Jill Messineo; A.S., by
and through her parents and natural guardians, Russell Senesac and
Selena Senesac, other Russell Senesac, other Selena Senesac; RUSSEL
SENESAC, individually; SELENA SENESAC, individually,
*Plaintiffs*,

*v.*

DANIEL M. FRENCH, in his official capacity as Secretary of the
Vermont Agency of Education,
*Defendant-Appellee*,

GEORGE B. SPAULDING, in his official capacity as Chancellor of
the Vermont State Colleges System, AKA Jeb,
*Defendant*.[*]

————

Appeal from the United States District Court
for the District of Vermont.

————

Before: WALKER and MENASHI, *Circuit Judges*.[**]

————

Plaintiff-Appellant A.H. is a senior at Rice Memorial High School, a ministry of the Roman Catholic Diocese of Burlington, Vermont. In August 2020, A.H. sought to participate in the Dual Enrollment Program administered by Vermont's Agency of Education. The program pays tuition for high school juniors and seniors to take up to two courses at approved Vermont colleges. To be eligible for the program, A.H. was required to demonstrate that her Rice tuition was "publicly funded." When she applied for public funding, however, her application was denied solely because of her school's religious status.

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

[**] Senior Circuit Judge Ralph K. Winter, originally a member of this panel, died on December 8, 2020. This appeal has been decided by the two remaining members of the panel, who are in agreement. *See* 2d Cir. IOP E(b).

A.H., her parents, and the Diocese sued the Agency of Education, alleging that the program's "publicly funded" requirement violated their rights under the Free Exercise Clause of the First Amendment as applied.  They also moved for a preliminary injunction requiring the agency to permit A.H. to access dual-enrollment benefits pending adjudication of their claims.  The district court (Reiss, *J.*) denied the motion, finding that the Dual Enrollment Program's eligibility requirements are facially neutral and generally applicable, were not motivated by a discriminatory intent, and do not impose unconstitutional burdens on religious exercise.  In the alternative, the district court held that any unconstitutional burden imposed on A.H. was caused by her local school district, not the agency.

For the reasons that follow, we conclude that the district court abused its discretion by denying the motion for a preliminary injunction, and therefore REVERSE.

Judge Menashi concurs in a separate opinion.

—————

JACOB P. WARNER, Alliance Defending Freedom, Scottsdale, AZ (Ryan J. Tucker, Alliance Defending Freedom, Scottsdale, AZ; David A. Cortman, Alliance Defending Freedom, Lawrenceville, GA; Kristen K. Waggoner, John J. Bursch, Alliance Defending Freedom, Washington, DC; Thomas E. McCormick,

McCormick, Fitzpatrick, Kasper & Burchard, P.C., Burlington, VT, *on the Brief*), *for Plaintiffs-Appellants*.

JOHN T. ALEXANDER, Assistant Attorney General (Benjamin D. Battles, Solicitor General; Rachel E. Smith, Assistant Attorney General, *on the brief*), Office of the Attorney General, Montpelier, VT, *for Defendant-Appellee.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiff-Appellant A.H. is a senior at Rice Memorial High School, a ministry of the Roman Catholic Diocese of Burlington, Vermont. In August 2020, A.H. sought to participate in the Dual Enrollment Program administered by Vermont's Agency of Education. The program pays tuition for high school juniors and seniors to take up to two courses at approved Vermont colleges. To be eligible for the program, A.H. was required to demonstrate that her Rice tuition was "publicly funded." When she applied for public funding, however, her application was denied solely because of her school's religious status.

A.H., her parents, and the Diocese sued the Agency of Education, alleging that the program's "publicly funded" requirement violated their rights under the Free Exercise Clause of the First Amendment as applied. They also moved for a preliminary injunction requiring the agency to permit A.H. to access dual-

enrollment benefits pending adjudication of their claims. The district court (Reiss, *J.*) denied the motion, finding that the Dual Enrollment Program's eligibility requirements are facially neutral and generally applicable, were not motivated by a discriminatory intent, and do not impose unconstitutional burdens on religious exercise. In the alternative, the district court held that any unconstitutional burden imposed on A.H. was caused by her local school district, not the agency.

For the reasons that follow, we conclude that the district court abused its discretion by denying the motion for a preliminary injunction, and therefore REVERSE.

**BACKGROUND**

The "publicly funded" requirement at issue in Vermont's Dual Enrollment Program (DEP) is governed in substance by restrictions on public funding imposed by Vermont's Town Tuition Program. Accordingly, we describe the statutory schemes that govern both government programs before presenting the facts that give rise to the claims in this case.[1]

---

[1] As we will explain further, we review the district court's findings of historical fact for clear error and we review the core constitutional facts de novo. *See United States v. Friday*, 525 F.3d 938, 950 (10th Cir. 2008).

## A.      The DEP and Vermont's Town Tuition Program

The DEP provides public funding for eligible high school students to dual-enroll in up to two courses at approved Vermont colleges.[2]   The program is designed to "expand high-quality educational experiences," "promote opportunities for Vermont students to achieve postsecondary readiness," and "increase the rates of secondary school completion and postsecondary continuation in Vermont."[3]   Vermont funds the DEP by paying tuition directly to approved colleges and universities, in amounts set by statute.[4]

Following the DEP's enactment in 2013, Vermont has made program funds available to high school juniors and seniors according to the following eligibility requirements.  "A Vermont resident who has completed grade 10 but has not received a high school diploma is eligible to participate in the Program" if the student:

(i)    is enrolled in:
   (I)     a Vermont public school, including a Vermont career technical center;
   (II)    a public school in another state or an approved independent school that is designated as the public secondary school for the student's district of residence; or

---

[2] *See* 16 V.S.A. § 944.
[3] *Id.* § 941(a)(1)–(3).
[4] *See id.* § 944(f)–(g).

> > > (III)   *an approved*[5] *independent school in Vermont to which the student's district of residence pays publicly funded tuition on behalf of the student*;
> > (ii)   is assigned to a public school through the High School Completion Program; or
> > (iii)   is a home study student . . . .[6]

Accordingly, the DEP is principally a public school program. It is available to students who attend public high schools as well as home study students who are statutorily entitled to participate in public school programs.[7]  As emphasized above, a student enrolled in a private (i.e., "independent") high school may receive DEP benefits only if her local school district has "publicly funded" her education by paying tuition on her behalf.

For Vermont's private school students, the DEP's "publicly funded" requirement intersects with Vermont's Town Tuition Program, pursuant to which some Vermont school districts use public funds to pay for students to attend private high schools.[8]  As the Vermont Supreme Court has described it, the Town Tuition Program

---

[5] "An independent school may operate and provide elementary education or secondary education if it is either approved or recognized" by the Vermont State Board of Education.  *Id.* § 166(a).  The State Board of Education "shall approve an independent school" if it meets minimum educational and other requirements.  *Id.* § 166(b).  A school's religious affiliation is not relevant to this determination, *id.*, and Rice Memorial High School (Rice) is an "approved" independent school.

[6] 16 V.S.A. § 944(b)(1).

[7] Vermont requires school districts to "integrate home study students" into their local public schools "through enrollment in courses, participation in cocurricular and extracurricular activities, and use of facilities."  *Id.* § 563(24).

[8] *See id.* § 822(a).

is quite simple: If a school district "provides elementary education, it is required to provide secondary education."[9] While school districts have "a number of options in meeting this obligation," they principally do so in one of two ways: (1) by maintaining a public high school within the district, or (2) by using public funds to pay tuition to an "approved public or independent high school" within or outside the district, to be selected by the parents or guardians of the student.[10]

Most of Vermont's school districts, including those in Vermont's most populous towns and cities, meet their obligations under the Town Tuition Program by maintaining public high schools. We refer to these districts as "Non-Sending Districts." In Non-Sending Districts, the public high school is the only "publicly funded" education available; students who choose to attend private high schools are never "publicly funded," regardless of whether they attend secular or religious schools. Because their tuition is not "publicly funded," private school students who live in Non-Sending Districts are not eligible to participate in the DEP.

Some school districts that are smaller and less populous, however, decline to maintain their own public high schools; they instead use public funds to pay for their students to attend approved independent schools or public schools in other districts. We refer to

---

[9] *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 738 A.2d 539, 544 (Vt. 1999).

[10] *Id.* (internal quotation marks omitted); *see also* 16 V.S.A. § 822(a).

these districts as "Sending Districts."  In Sending Districts, students attending either *secular* private schools or public schools in other districts receive "publicly funded" tuition, and are therefore eligible to participate in the DEP.  For students who choose to attend *religious* private schools, however, access to public funding—and thus DEP eligibility—is not always certain.  This is because, in Sending Districts, the use of public funds to pay tuition to religious schools has invited scrutiny under the Compelled Support Clause of Vermont's Constitution.

**B.    *Chittenden Town* and the Compelled Support Clause of Vermont's Constitution**

Nothing in the legislation establishing the Town Tuition Program prohibits Sending Districts from paying tuition to religious schools, but the Compelled Support Clause in Article 3 of Vermont's Constitution imposes limits.  That clause provides, in pertinent part, that "no person ought to, or of right can be compelled to . . . erect or support any place of worship, or maintain any minister, contrary to the dictates of conscience."[11]  In *Chittenden Town School District v. Department of Education*, the Vermont Supreme Court interpreted this clause to "prohibit[] compelled taxpayer support of religious worship," which includes "religious instruction."[12]  Accordingly, a

---

[11] Vt. Const. ch. I, art. 3.
[12] 738 A.2d at 562–63.

school district violates the Compelled Support Clause when it uses public funds to "reimburse[] tuition for a sectarian school under [16 V.S.A.] § 822 in the absence of adequate safeguards against the use of such funds for religious worship."[13]  The Chittenden Town School District, at the time, was a Sending District that declined to maintain its own public high school.[14]  Applying the rule it announced, the Court held Chittenden Town's tuition-payment policy "unconstitutional . . . to the extent that it authorize[d] tuition reimbursement to sectarian schools without appropriate restrictions."[15]

*Chittenden Town*'s call for "adequate safeguards" created uncertainty in Sending Districts.  What safeguards are "adequate" under *Chittenden Town*?  Which government entity—the State or the district—should develop and apply them?  But in the more than twenty years since *Chittenden Town* was decided, Vermont has neither amended the Town Tuition Program nor identified adequate safeguards to ensure that Sending Districts do not use public funds to support worship at religious schools.  Moreover, since at least 2010, officials of the Vermont Agency of Education (AOE) have frequently

---

[13] *Id.* at 541–42.  Although the Court determined that there was "no way to separate religious instruction from religious worship," it emphasized that compelled support for a place of worship does not violate Vermont's Constitution "unless the compelled support is for the 'worship' itself."  *Id.* at 550, 562.

[14] *Id.* at 544.

[15] *Id.* at 563–64.

stated that Sending Districts may not publicly fund tuition for students attending religious schools. A March 2010 AOE white paper, for example, states that Sending Districts may pay tuition to "approved independent schools that parents choose, within or outside Vermont, *not including religious schools*."[16] The same was published in an AOE white paper dated December 2012, and similar statements have been made as recently as December 2019. Notwithstanding this guidance from the AOE, some Sending Districts have over the past twenty years used public funds to pay tuition for eighty students attending religious schools. The record does not show, however, whether these Sending Districts have extended funding in violation of *Chittenden Town* or pursuant to the presence of safeguards.

Although *Chittenden Town* addressed only the Town Tuition Program and not the DEP, the DEP's "publicly funded" requirement effectively adopts any restrictions to public funding in the Town Tuition Program. As a result, some Vermont officials have issued guidance stating that students at religious schools are categorically ineligible for DEP benefits. In 2013, for example, the AOE's general counsel emailed the principal of Rice Memorial High School (Rice), a religious school within the Plaintiff-Appellant Diocese, stating that the DEP "limits dual enrollment funding to students in approved

---

[16] J. App. at 364 (emphasis added).

independent[] [schools] who are publicly funded . . . which unfortunately leaves Rice out."[17] And, in December 2015, a DEP coordinator stated that "[s]tudents at a Christian or parochial school or privately funded students are not eligible for Dual Enrollment."[18] If those students want to participate in the DEP, they "would need to be unenrolled at the Christian/parochial school and be enrolled in a publicly funded school."[19]

In summary, the *Chittenden Town* decision created uncertainty as to whether Sending Districts could publicly fund tuition for students attending religious schools. Because students in Sending Districts must show that their tuition is "publicly funded" to qualify for the DEP, this uncertainty affects the administration of the DEP as well. While students in Sending Districts who choose to attend secular private schools routinely obtain public funding that allows them to dual-enroll through the DEP, no religious schools nor any of their students have ever been approved to participate in the program.

## C.    Appellant A.H.'s Attempt to Participate in the DEP

Appellant A.H. lives with her parents in South Hero, Vermont, a Sending District that does not maintain a public high school. A.H.'s parents, who are Catholic, sought to send their daughter to a school that shares their faith. As a result, they enrolled A.H. at Rice. Rice's

---

[17] *Id.* at 135.
[18] *Id.* at 140.
[19] *Id.*

teachers and staff provide faith-based academic instruction, including instruction in Catholic doctrine. For these reasons, Rice has been a good fit for A.H. and her parents.

As a high school senior, A.H. wished to dual-enroll in two science classes at the University of Vermont. A.H.'s parents could not afford to pay for these classes in addition to paying Rice tuition, so A.H. sought to enroll through the DEP. Because the DEP requires students in Sending Districts to show that their tuition is "publicly funded," A.H. timely applied to her local school district for public funding of her Rice tuition. The district denied A.H.'s application, stating, "Unfortunately Rice is a religious school for which we do not pay tuition."[20] A.H. declined to pursue an administrative appeal to the AOE. As a result, A.H.'s tuition at Rice is not "publicly funded" and she remains ineligible to participate in the DEP.

Around the same time that A.H. applied for public funding of her Rice tuition, Rice sought approval to participate in the DEP. The AOE denied Rice's application because it was untimely. Even if Rice's application had been timely, however, it is undisputed that the application would have been denied because none of Rice's students received "publicly funded" tuition.

---

[20] J. App. at 347. In denying A.H.'s application, the district cited to school-choice guidance published on EdChoice.org, which stated that, under Vermont's Town Tuition Program, "[t]he sending town pays tuition directly to the 'receiving' school, which can be any public or private, *non-religious* school in or outside Vermont." *Id.* (emphasis added by the district).

**D.     Prior Proceedings**

Appellants A.H., her parents, and the Diocese, as well as several additional plaintiffs,[21] brought this action in the District of Vermont, alleging that the DEP's "publicly funded" requirement discriminates against religious school students in violation of their free-exercise and equal-protection rights under the First and Fourteenth Amendments.  Although Appellants initially claimed that the DEP's eligibility criteria were facially unconstitutional, including as applied in both Sending and Non-Sending Districts, they have since abandoned their facial challenge.  They continue to challenge the DEP's eligibility criteria only as applied to religious school students in Sending Districts.[22]

On March 20, 2020, Appellants moved for a preliminary injunction requiring Daniel M. French, Secretary of the AOE, to allow A.H. and Rice to participate in the DEP notwithstanding their present inability to satisfy the "publicly funded" requirement.  Following a hearing, the district court denied the motion.  The district court ruled that, even assuming A.H. could show irreparable harm, she failed to make a clear showing that she was likely to succeed on the merits. Specifically, the district court concluded that the DEP's eligibility

---

[21] This interlocutory appeal concerns only claims by A.H., her parents, and the Diocese.

[22] Several plaintiffs who are not appellants here, including A.S., A.M., and E.M., are residents of Non-Sending Districts that maintain public high schools.

requirements are facially neutral and generally applicable, were not motivated by discriminatory intent, and do not impose unconstitutional burdens on religious exercise. In the alternative, the district court held that any burden imposed on A.H. was imposed by her local school district, not the AOE, because A.H. and her parents declined to pursue an administrative appeal to the AOE. Appellants timely appealed.

On June 26, 2020, Appellants moved for an emergency injunction ordering Secretary French to permit A.H. to participate in the DEP while this appeal was pending. Following the Supreme Court's June 30, 2020 decision in *Espinoza v. Montana Department of Revenue*,[23] a motions panel of this Court granted Appellants' motion and A.H. dual-enrolled at the University of Vermont.

## DISCUSSION

On appeal, Appellants argue that the district court erred by denying their motion for a preliminary injunction. They contend that they will likely succeed in showing that, as applied, the DEP's "publicly funded" requirement violates their First Amendment right to freely exercise their religion, and that the equities favor preliminary injunctive relief.[24] For the reasons that follow, we agree.

---

[23] 140 S. Ct. 2246 (2020)

[24] Appellants also argue that the DEP's eligibility requirements violate their equal protection rights under the Fourteenth Amendment as applied. Because we hold

## I.      Standard of Review

We review a district court's denial of a preliminary injunction for abuse of discretion.[25] "A district court abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions."[26]

The parties dispute whether we should review the "core constitutional facts" de novo or simply for clear error. In the context of First Amendment claims under the Free Speech Clause, we have adhered to the Supreme Court's instruction to "'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'"[27] This more searching review aims to ensure that we independently "determine the constitutional importance of the facts of the case,"[28] particularly "where a conclusion of law as to a Federal

that a preliminary injunction should issue based on Appellants' First Amendment claim, we need not address their equal protection argument on this appeal.

[25] *Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 176 (2d Cir. 2020).

[26] *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 627 (2d Cir. 2018) (quoting *EEOC v. Karenkim, Inc.*, 698 F.3d 92, 99–100 (2d Cir. 2012)).

[27] *Bronx Household of Faith v. Bd. of Edu. of City of N.Y.*, 331 F.3d 342, 348 (2d Cir. 2003) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)).

[28] *New Life Baptist Church Acad. v. Town of E. Longmeadow*, 885 F.2d 940, 941–42 (1st Cir. 1989) (Breyer, *J.*).

right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts."[29]

Several of our sister circuits have applied this standard of review to cases involving the Free Exercise Clause of the First Amendment,[30] and we see no reason to take a different approach. The Supreme Court has generally favored de novo review in "the constitutional realm,"[31] and its purpose in requiring an independent examination of the record in First Amendment free speech cases logically extends to review of claims under the same amendment's Free Exercise Clause. As the Tenth Circuit observed, "Freedom of religion, no less than freedom of speech, is a promise of the 'First Amendment . . . essential to the common quest for truth and the vitality of society as a whole.'"[32]  Accordingly, we review the core

---

[29] *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 567 (1995); *see also ACLU of Fla., Inc. v. Miami-Date Cnty. Sch. Bd.*, 557 F.3d 1177, 1204 (11th Cir. 2009) (applying de novo review where "the Board's motive is the ultimate fact upon which the resolution of the constitutional question depends"). While the requirement of independent appellate review requires us to scrutinize the factual record, it "does not limit our deference to a trial court on matters of witness credibility." *Hurley*, 515 U.S. at 567.

[30] *See United States v. Friday*, 525 F.3d 938, 950 (10th Cir. 2008) (collecting cases); *United States v. Israel*, 317 F.3d 768, 770 (7th Cir. 2003); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 156–57 (3d Cir. 2002); *New Life Baptist Church*, 885 F.2d at 941–42.

[31] *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 & n.4 (2018) (explaining that "the role of appellate courts 'in marking out the limits of a standard through the process of case-by-case adjudication' favors *de novo* review," even when the analysis involves "plunging into a factual record" (quoting *Bose*, 466 U.S. at 503) (alteration omitted)).

[32] *Friday*, 525 F.3d at 950 (quoting *Bose*, 466 U.S. at 503–04).

constitutional facts de novo. We review other historical facts, including "the who, what, where, when, and how of the controversy," for clear error.[33]

## II.    Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."[34]   "Ordinarily, to obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to 'demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'"[35]  "The movant also must show that the 'balance of equities tips in his or her favor.'"[36]  In cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm.[37]  Likelihood of

---

[33] *See Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011).

[34] *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[35] *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020) (quoting *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016)).

[36] *Id.* (alteration omitted) (quoting *Winter*, 555 U.S. at 20).

[37] *See Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996); *see also Agudath Israel of Am. v. Cuomo*, No. 20-3572, 2020 WL 7691715, at *10 (2d Cir. Dec. 28, 2020) ("Religious adherents are not required to establish irreparable harm independent of showing a Free Exercise Clause violation . . . .").

success on the merits is therefore "the dominant, if not the dispositive, factor."[38]

The standard for obtaining preliminary injunctive relief is higher, however, where the movant seeks "to modify the status quo by virtue of a '*mandatory* preliminary injunction' (as opposed to seeking a '*prohibitory* preliminary injunction' to maintain the status quo)."[39]  In this circumstance, the movant must also "make a 'strong showing' of irreparable harm" and "demonstrate a 'clear or substantial likelihood of success on the merits.'"[40]  The district court held that Appellants' requested injunction was mandatory in nature and subject to this higher standard.  Appellants argue that this ruling was in error, but we disagree.

"Because the proposed injunction's effect on the status quo drives the standard, we must ascertain the status quo—that is, 'the

---

[38] *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

[39] *Yang*, 960 F.3d at 127 (emphases in original) (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) ("[A] mandatory preliminary injunction . . . alters the status quo by commanding some positive act . . . ." (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010)))).  As the district court explained and the parties have acknowledged, the standard is also higher "where the injunction being sought 'will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Yang*, 960 F.3d at 127–28 (quoting *New York ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).  Because Appellants request a mandatory injunction, we need not address this alternative basis for imposing the higher legal standard.

[40] *Yang*, 960 F.3d at 128 (first quoting *Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir. 1981), and then quoting *Mastrovincenzo*, 435 F.3d at 89).

last actual, peaceable uncontested status which preceded the pending controversy.'"[41]   Here, Appellants acknowledge that "no religious schools or students in them" have participated in the DEP since the program was enacted in 2013.[42]   A.H. sought and was denied dual-enrollment funds more than five years after Vermont established the program, and the State continues to deny eligibility to non-"publicly funded" students.   Notwithstanding the recent nature of this dispute, Appellants urge us to fix the status quo at a time before the DEP was enacted, when they claim religious school students could access a similar dual-enrollment benefit under a separate (and now expired) State program.   We decline to do so.   Vermont has applied the DEP's eligibility requirements for the better part of a decade.   Appellants' requested injunction would alter this status quo by mandating A.H.'s inclusion in a State program for which she is, and has always been, statutorily ineligible.[43]   Accordingly, the district court correctly applied the higher legal standard for a mandatory injunction.

## III.   Likelihood of Success on the Merits

The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting the establishment of religion,

---

[41] *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)).

[42] Pls.-Appellants' Br. at 36 (emphasis omitted).

[43] This posture is therefore distinguishable from a "benefits-termination" case, where the "status quo is one in which the plaintiff continues receiving previously granted benefits." *See N. Am. Soccer League*, 883 F.3d at 37.

or prohibiting the free exercise thereof."[44]  The Supreme Court has recognized "a 'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels."[45]  Here, we agree with the parties that religious school students could participate in the DEP without violating the Establishment Clause.  "[T]he Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs."[46]  And any Establishment Clause objections would be particularly unfounded here, because Vermont funds the DEP by paying tuition directly to Vermont colleges—not religious high schools.  Even then, DEP funds make their way to a particular college or university only as a result of Vermont students or families "independently choosing" where they wish to dual-enroll.[47]  We therefore focus on whether the DEP's "publicly funded" requirement, as applied, violates A.H.'s right to freely exercise her religious beliefs.

The Free Exercise Clause, which applies to the states through the Fourteenth Amendment, "'protects religious observers against unequal treatment' and against 'laws that impose special disabilities

---

[44] U.S. Const. amend. I.

[45] *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *Locke v. Davey*, 540 U.S. 712, 718 (2004)).

[46] *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2254 (2020).

[47] *See id.* at 2254; *see also Zelman v. Simmons-Harris*, 536 U.S. 639, 649–53 (2002) (rejecting Establishment Clause challenge to state voucher program that made tuition assistance available to parents to send their children to religious schools).

on the basis of religious status.'"[48]    Applying these "basic principle[s]," the Supreme Court has confirmed that "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'"[49]

In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, the Supreme Court considered a free-exercise challenge to a Missouri grant program that provided subsidies for playground resurfacing at preschool and daycare centers. To comply with antiestablishment principles in Missouri's state constitution, the program disqualified any organization "owned or controlled by a church, sect, or other religious entity."[50]    The petitioner, Trinity Lutheran Church, submitted an application to use grant funds for a rubber-resurfacing project at its preschool and daycare center.[51]  Although the church's application was highly ranked, the Missouri agency implementing the program determined that the church was "categorically ineligible" to receive a grant.[52]

---

[48] *Espinoza*, 140 S. Ct. at 2255 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021); *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988) (explaining that the government "penalize[s] religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens").

[49] *Trinity Lutheran*, 137 S. Ct. at 2019 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978) (plurality opinion)).

[50] *Id.* at 2017.

[51] *Id.* at 2017–18.

[52] *Id.* at 2018.

On appeal, the Supreme Court held that Missouri's restrictive policy violated the church's rights under the Free Exercise Clause.[53] Although the State had not "criminalized the way Trinity Lutheran worships or told the Church that it cannot subscribe to a certain view of the Gospel," the policy discriminated against the church "simply because of what it is—a church."[54]  That status-based discrimination, the Court explained, imposed a "penalty on the free exercise of religion."[55]  In effect, the policy "put[] [the church] to a choice:  It [could] participate in an otherwise available benefit program or remain a religious institution."[56]  Because a State "punishe[s]" free exercise when it "condition[s] the availability of benefits upon a recipient's willingness to surrender his religiously impelled status,"[57] the Supreme Court held that this choice "trigger[ed] the most exacting scrutiny," which Missouri could not meet.[58]

The Supreme Court affirmed these principles in *Espinoza v. Montana Department of Revenue*, when it considered whether Montana violated the Free Exercise Clause by prohibiting the use of state scholarship funds to support sectarian schools.[59]  In 2015, the

---

[53] *Id.* at 2021–25.

[54] *Id.* at 2022–23.

[55] *Id.* at 2021.

[56] *Id.* at 2021–22.

[57] *Id.* at 2022 (alterations omitted) (quoting *McDaniel*, 435 U.S. at 626).

[58] *Id.* at 2021.

[59] 140 S. Ct. at 2252.

Montana Legislature had enacted a scholarship program to benefit students attending private schools.[60]   Although the program permitted scholarship funds to be used at either secular or religious private schools, the Montana Supreme Court struck it down, holding that the program violated the state constitution's "guarantee to all Montanans that their government will not use state funds to aid religious schools."[61]   The Supreme Court reversed.   Following the lessons of *Trinity Lutheran*, the Supreme Court held that the "no-aid" provision of Montana's constitution "'impose[d] special disabilities on the basis of religious status' and 'condition[ed] the availability of benefits upon a recipient's willingness to surrender its religiously impelled status.'"[62]   The Montana Supreme Court's application of the provision could not survive strict scrutiny.[63]

Notably, Montana argued in *Espinoza* that *Trinity Lutheran* should not control because the no-aid provision constitutes a *use*-based restriction rather than *status*-based discrimination.[64]   In *Trinity Lutheran*, four of the six justices who joined the majority declined to address "religious uses of funding," emphasizing that the case involved only "express discrimination based on religious identity."[65]

---

[60] *Id.* at 2251.

[61] *Id.* at 2253 (quoting *Espinoza v. Mont. Dept. of Revenue*, 393 Mont. 446, 467 (2018)).

[62] *Id.* at 2256 (alteration omitted) (quoting *Trinity Lutheran*, 137 S. Ct. at 2021–22).

[63] *Id.* at 2260–61.

[64] *Id.* at 2255, 2257.

[65] 137 S. Ct. at 2024 n.3.

Because a "goal or effect" of the no-aid provision was to prevent state funds from being used for "religious education," Montana argued that the case should instead be governed by *Locke v. Davey*.[66] In *Locke*, the Supreme Court held that the State of Washington did not violate the Free Exercise Clause when it prohibited a student from using scholarship funds to pursue a degree in devotional theology.[67]

The Supreme Court rejected Montana's argument for two reasons relevant here. First, it explained that the restriction in *Locke* was limited to "the 'essentially religious endeavor' of training a minister 'to lead a congregation.'"[68] Unlike that "narrow restriction," which was supported by an "historic and substantial" state interest in not using public monies to fund the clergy, the no-aid provision of Montana's Constitution did not "zero in on any particular 'essentially religious' course of instruction at a religious school."[69] Instead, it barred "all aid to a religious school" based on nothing more than the school's religious character.[70] Second, the Supreme Court emphasized that, even assuming Montana had legitimate concerns about scholarship funds being used for religious purposes, "those considerations were not the Montana Supreme Court's basis for applying the no-aid provision to exclude religious schools; that

---

[66] 540 U.S. 712 (2004); *Espinoza*, 140 S. Ct. at 2257.

[67] 540 U.S. at 719.

[68] *Espinoza*, 140 S. Ct. at 2257 (quoting *Locke*, 540 U.S. at 721).

[69] *Id.* at 2257 (quoting *Locke*, 540 U.S. at 725).

[70] *Id.*

hinged solely on religious status."[71]   The Court concluded that "[s]tatus-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses."[72]

After *Trinity Lutheran* and *Espinoza*, Appellants have a clear likelihood of success on the merits of their as-applied First Amendment claim.  In Sending Districts, all high school juniors and seniors attending public schools and secular private schools meet the statutory requirements to be eligible for the DEP.  Provided their secondary school of choice meets certain minimum requirements, their tuition is always "publicly funded."[73]   But, as this case demonstrates, that is not true for students in Sending Districts who choose to attend religious schools.  Here, A.H. was denied public funding—and thus eligibility for the DEP—solely because of her school's religious status.  Indeed, in the district's email denying A.H.'s application, it provided a single explanation:  "Rice is a religious school[.]"[74]

In these circumstances, the State's reliance on the "publicly funded" requirement as a condition for DEP eligibility imposes a "penalty on the free exercise of religion."[75]  It forces Rice to choose

---

[71] *Id.* at 2256.

[72] *Id.*

[73] *See* 16 V.S.A. § 944(b)(1); *see also id.* § 166(a).

[74] J. App. at 347.

[75] *Trinity Lutheran*, 137 S. Ct. at 2019.

whether to "participate in an otherwise available benefit program or remain a religious institution."[76] At the same time, the requirement puts A.H.'s family to a choice "between sending their child[] to a religious school or receiving such benefits."[77] As the Supreme Court explained in *Trinity Lutheran*, the denial of a generally available benefit solely on account of religious identity "can be justified only by a state interest 'of the highest order.'"[78] The AOE has not identified any compelling interest that could survive strict scrutiny.[79] It has not even argued that it could.

Instead, the AOE advances three arguments. First, it argues that the DEP's "publicly funded" requirement is religion-neutral and generally applicable, such that any adverse impact on religious school students in Sending Districts should not be subject to strict scrutiny. Second, it argues that a preliminary injunction should not issue because "it is not clear whether" A.H.'s school district, in denying her application for public funding, "engaged in the very sort of religious 'status-based discrimination' subject to strict scrutiny under the Free

---

[76] *Id.* at 2021–22.

[77] *Espinoza*, 140 S. Ct. at 2257.

[78] 137 S. Ct. at 2019 (quoting *McDaniel*, 435 U.S. at 628).

[79] While the AOE has not articulated any basis upon which it contends the DEP survives strict scrutiny, we note that a State's interest in "separating church and State 'more fiercely' than the Federal Constitution" would not qualify as compelling in the face of the infringement of free exercise here. *See Espinoza*, 140 S. Ct. at 2260 (citation omitted).

Exercise Clause."[80]    Third, it argues that it should not be held responsible for any status-based discrimination that occurred here because A.H. declined to pursue an administrative appeal.    We address each of these arguments in turn.

First, the AOE argues that *Trinity Lutheran* and *Espinoza* should not govern this case because the DEP does not "single out the religious for disfavored treatment."[81]  It argues that, under *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, the district court properly found that the DEP's eligibility requirements are neutral and generally applicable.[82]  We disagree.  Because "the effect of [the] law in its real operation" burdens only religious school students in Sending Districts and no others, we cannot conclude that the DEP is religion-neutral.[83]

As a threshold matter, the AOE asks us to assess the neutrality of the DEP's eligibility requirements by considering its effects in Non-Sending Districts, where most of Vermont's high school students reside.  In these districts, the DEP's "publicly funded" requirement appears religion-neutral: it excludes all students attending private schools—whether secular or religious.  This evidence, according to the AOE, indicates that the DEP's "potential exclusion" of a relatively

---

[80] Def.-Appellee's Br. at 29.

[81] *Trinity Lutheran*, 137 S. Ct. at 2020.

[82] *See* 508 U.S. 520, 535 (1993).

[83] *See id.* at 535–36.

smaller number of religious school students in Sending Districts is merely an "incidental" effect of an otherwise neutral law.[84]

But, by looking principally to students who reside in Non-Sending Districts, the AOE elides a key feature of the DEP's statutory scheme: the "publicly funded" requirement in § 944(b)(1)(A)(i)(III) is *directed* at students in *Sending Districts*. The principal if not sole purpose of that provision is to extend DEP benefits to students in Sending Districts who, unlike students in Non-Sending Districts, may not have access to a public school education.[85] When evaluating the effect of a law, the Supreme Court has instructed us to "survey meticulously the circumstances of governmental categories" created by statute.[86] Consistent with that command, we assess the neutrality of the law as applied to students in Sending Districts, who are plainly the object of the provision in question.

In Sending Districts, like the one encompassing South Hero, Vermont, the burden of the DEP's "publicly funded" requirement is borne exclusively by students attending religious schools. This is no

---

[84] Def.-Appellee's Br. at 61.

[85] Consider the impact of deleting § 944(b)(1)(A)(i)(III) from the DEP's enacting statute. While the alteration would eliminate eligibility for many students in Sending Districts, it would have no impact on the current eligibility of students in Non-Sending Districts. All private school students in Non-Sending Districts would remain ineligible for the DEP—regardless of whether they attend secular or religious schools—because the statute would still limit eligibility to students "enrolled in . . . [a] public school." *See* 16 V.S.A. § 944(b)(1)(A)(i)(I), (II).

[86] *Church of the Lukumi*, 508 U.S. at 534 (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (1970) (Harlan, *J.*, concurring)).

accident, and it should come as no surprise. When the Vermont Supreme Court decided *Chittenden Town* in 1999, it created substantial uncertainty as to whether Sending Districts could publicly fund tuition at religious schools without running afoul of the Compelled Support Clause of Vermont's Constitution. Although the decision permits public funding to religious schools if "adequate safeguards" are present,[87] the State has never identified any adequate safeguards or explained how they might apply. Instead, since at least 2010, the AOE has simply stated that Sending Districts may not pay tuition to "religious schools."[88]

The Vermont legislature enacted the DEP in 2013 against this backdrop and with knowledge of these constitutional constraints.[89] By including the "publicly funded" requirement as a condition for eligibility in Sending Districts, the program necessarily adopted any restrictions that *Chittenden Town* imposed. Given that the AOE has for years interpreted *Chittenden Town* to state that Sending Districts may not publicly fund students attending religious schools, it is unremarkable that DEP administrators have stated on several

---

[87] *See Chittenden Town*, 738 A.2d 539 at 541–42.

[88] *See, e.g.*, J. App. at 364 (AOE White Paper dated March 2010 stating that Sending Districts may pay tuition to "approved independent schools that parents choose, within or outside Vermont, *not including religious schools*." (emphasis added)); *id.* at 367 (AOE White Paper dated December 2012 stating the same).

[89] We presume that a state legislature "is knowledgeable about existing law pertinent to the legislation it enacts." *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988).

occasions that the DEP is not available to religious school students. As the AOE acknowledged in its briefing to the district court, "Section 944's 'publicly funded' requirement has the effect of excluding participation in the Dual Enrollment Program by . . . students [in Sending Districts] . . . who choose to attend a religious independent school and thus, by operation of the *Chittenden Town* decision, forfeit publicly funded secondary education."[90] While the AOE takes a more nuanced view of *Chittenden Town* in this appeal, it is clear that in at least some cases religious school students wishing to participate in the DEP must "be unenrolled at the Christian/parochial school and be enrolled in a publicly funded school."[91]

Most importantly for our purposes, the record on this appeal plainly evidences religious discrimination. In the seven years since the DEP was enacted, no religious schools nor any of their students have ever been approved to participate. And when A.H. sought to dual-enroll, her school district declined to fund her high school tuition—and thus the DEP denied her application—simply because "Rice is a religious school."[92] Even observing that *some* religious school students have obtained public funding such that they might participate in the DEP,[93] Appellants have made a substantial showing

---

[90] J. App. at 27.
[91] *Id.* at 140.
[92] *Id.* at 347.
[93] *See id.* at 402, 405.

that the burden of the "public funding" requirement falls by design on religious school students and almost no others.[94] We therefore reject the AOE's assertion that the DEP is religion-neutral as applied.

Second, and in the alternative, the AOE argues that a preliminary injunction should not issue because, in denying A.H.'s application for public funding, "it is not clear whether" her school district "engaged in the very sort of religious 'status-based discrimination' subject to strict scrutiny under the Free Exercise Clause."[95] The AOE suggests that A.H.'s district may have properly applied *Chittenden Town* and denied public funding because "no adequate safeguards could be put in place" to prevent the district from supporting religious worship.[96] If the district engaged in this analysis, the AOE insists that the district's denial of public funding would constitute a use-based restriction that cures any free-exercise problem caused by the DEP's reliance on the "publicly funded" requirement.

Here, however, the AOE's argument assumes a faulty premise. The record is clear—at least at this stage of the proceedings—that A.H.'s school district denied her application for public funding solely based on her school's religious status. While the AOE insists that Sending Districts would not "ignor[e] or defy[] their obligation under

---

[94] *See Church of the Lukumi*, 508 U.S. at 536.

[95] Def.-Appellee's Br. at 29.

[96] *Id.*

Vermont law" to consider safeguards,[97] it has not pointed to any direct evidence showing that "adequate safeguards" (or, more precisely, their absence) were considered here.[98] In light of this record, we need not presume that the denial of public funding was anything but status based. Even if the district was motivated by a desire to prevent the use of public funds for religious worship, the Supreme Court explained in *Espinoza* that "[s]tatus-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses."[99]

Because our decision "turns expressly on religious status and not religious use," we express no view in this opinion as to whether *Chittenden Town*'s requirement of "adequate safeguards" could, if

---

[97] *Id.* at 65.

[98] The concurring opinion relies on two documents in the record suggesting that, in 2000 and 2015, the AOE may have implemented adequate safeguards through a "pervasively sectarian" test. *See* J. App. at 370–73. Based on this evidence, the concurring opinion first infers that A.H.'s school district may have applied a similar test and then concludes that any such test would violate the First Amendment. In the view of solely the author of this opinion, there is not an adequate basis for drawing that inference and reaching the constitutionality of the "adequate safeguards" framework. The school district's email denying public funding does not mention adequate safeguards or apply any "pervasively sectarian" criteria. *Id.* at 347. Instead, it states that "Rice is a religious school" and, citing guidance from EdChoice.org, emphasizes that public tuition may be paid only to a "*non-religious* school." *Id.* (emphasis in original). Even if A.H.'s district had applied an "adequate safeguards" test, that test would appear to have no place in the DEP, which finances dual-enrollment by paying tuition directly to approved Vermont colleges—bypassing the religious high schools at issue here. *See infra* at 34.

[99] *Espinoza*, 140 S. Ct. at 2256.

applied, constitute a use-based restriction that survives First Amendment scrutiny.[100] We note, however, that even if an "adequate safeguards" test could be constitutionally applied in the context of the Town Tuition Program,[101] that may not mean that the restriction could be constitutionally applied to the DEP. The Vermont Supreme Court imposed the "adequate safeguards" test to prevent State funds from supporting worship at religious schools.[102] Public funds allocated to the DEP, however, never go to religious high schools; the State finances dual-enrollment by paying tuition directly to approved Vermont colleges.[103] In the context of the DEP, therefore, the "adequate safeguards" test would appear to burden only religious school students despite no risk of religious use.

Finally, the AOE argues that it should not be held responsible for the status-based discrimination that occurred here because it does not directly control funding decisions by local school districts and

---

[100] *See id.* (rejecting Montana's invitation to analyze the no-aid provision as a use-based restriction under *Locke v. Davey*, 540 U.S. 712 (2004)). In *Locke*, the Supreme Court upheld a state policy that prohibited the use of scholarship funds for "religious instruction that will prepare students for the ministry." 540 U.S. at 719. There, the scholarship program went "a long way toward including religion in its benefits" and "permit[ted] students to attend pervasively religious schools." *Id.* at 724.

[101] We note that in *Carson as next friend of O.C. v. Makin*, the First Circuit recently held that a "non-sectarian" requirement in the State of Maine's school tuition program qualified as a use-based restriction that survives *Espinoza*. 979 F.3d 21, 45–46 (1st Cir. 2020). In this case, however, we agree with Appellants that we need not decide the question.

[102] *Chittenden Town*, 738 A.2d at 550, 562.

[103] *See* 16 V.S.A. § 944(f).

A.H. declined to pursue an administrative appeal.[104]   While the district court relied on this fact as an alternative basis for denying the motion, we disagree that it is dispositive here.  For the reasons already discussed, Appellants have made a substantial showing that, in Sending Districts, the burden of the "public funding" requirement falls on religious school students and no others.   The AOE is statutorily charged with administering the DEP, and it bears ultimate responsibility for unconstitutionally applying the "publicly funded" requirement in this case.

## IV.   Additional Preliminary Injunction Factors

Because we hold that Appellants have demonstrated a clear or substantial likelihood of success on the merits of their as-applied First Amendment claim, we have little difficulty concluding that the remaining factors favor a preliminary injunction.  The denial of a constitutional right ordinarily warrants a finding of irreparable harm, even when the violation persists for "minimal periods" of time.[105]  In this case, the AOE's unconstitutional application of the "publicly funded" requirement is enduring and, for A.H., permanent.  Absent

---

[104] *See* Def.-Appellee's Br. at 17–20; *see also* Special App. at 6 § 10.

[105] *Int'l Dairy Foods*, 92 F.3d at 71; *see also Agudath Israel*, 2020 WL 7691715, at *11 ("[T]he deprivation of First Amendment rights is an irreparable harm . . . .").

a preliminary injunction, A.H. will lose her last opportunity to participate in the program when she graduates this Spring.

The balance of equities also favors injunctive relief. In addition to A.H.'s strong interest in dual-enrolling at the University of Vermont before she leaves for college, the issuance of a preliminary injunction advances Rice's ability to attract talented students from Sending Districts who may also be interested in the DEP. Although we acknowledge that the State has an interest in administering its laws without interference by federal equitable power,[106] that interest is diminished when the laws at issue likely impinge a federal constitutional right.

Finally, the public interest is well served by the correction of this constitutional harm. A.H. is entitled to join her peers at public schools and secular private schools by participating in the DEP. We reject the AOE's contention that extending this generally available governmental benefit to A.H. "will worsen, not ameliorate," religious and secular communities' perceptions of unequal treatment under the law.[107]

## CONCLUSION

We conclude that Appellants have demonstrated a clear or substantial likelihood of success on the merits of their First

---

[106] *See City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983).

[107] Def.-Appellee's Br. at 69.

Amendment claim, and that the remaining factors merit preliminary injunctive relief. Therefore, we REVERSE the judgment of the district court and grant the motion for a preliminary injunction. Notwithstanding A.H.'s inability to satisfy the "publicly funded" requirement, Secretary French is ordered to permit A.H. to participate in the DEP pending final adjudication of the merits of this case.

MENASHI, *Circuit Judge*, concurring:

I join the opinion of the court holding that A.H. has a clear likelihood of prevailing on her claim that the Vermont Agency of Education ("AOE") and Secretary of Education Daniel M. French violated her right to the free exercise of religion under the First Amendment. The AOE determined that neither Rice Memorial High School nor A.H. could participate in the state's publicly funded Dual Enrollment Program ("DEP"), and the record indicates that this disqualification was based on religious status—because "Rice is a religious school." J. App'x 347.

The AOE argues that A.H. was disqualified from the program not because "Rice is a religious school" but because—in the judgment of officials in the school district of South Hero, Vermont—Rice lacks the "adequate safeguards" for the use of public funds that the Vermont Supreme Court has required of religious institutions. *See ante* at 32; *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 738 A.2d 539, 541-42, 562-63 (Vt. 1999). The court's opinion correctly notes that, given the record at this stage, the AOE is unlikely to establish that South Hero officials considered anything other than the religious character of the school. *Ante* at 32-33. I write separately to note that, even if the AOE were to establish that the disqualification followed from an application of the "adequate safeguards" framework, the disqualification still would violate A.H.'s rights under the First Amendment.

I

In the two decades since the Vermont Supreme Court decided *Chittenden Town*, neither the court nor any other state official has explained what "adequate safeguards" are required of religious schools. Yet, as the AOE points out, since *Chittenden Town*, at least

thirty-three sending districts have—in at least eighty instances—funded tuition payments for students to attend religious schools under the Town Tuition Program ("TTP"). J. App'x 402, 405. Those decisions would have allowed the funded students to qualify for the DEP. Given this evidence, the AOE suggests, not all school districts are categorically excluding religious schools from the TTP. Rather, these districts must be applying some version of an "adequate safeguards" analysis.

The AOE does not explain how that analysis works in practice. Two documents in the record, however, indicate that the AOE and French understand the "adequate safeguards" requirement to prohibit funding religious schools deemed to be "pervasively sectarian"—that is, schools that do not sufficiently distinguish between secular and religious activities. In a 2015 email, French—at the time a school district superintendent—explained to the general counsel of the AOE that he believed "a 'pervasively sectarian' school" was "not eligible for public tuition support." J. App'x 370. He wrote that he uses "subjective criteria to determine a school's sectarian nature: 1) is the school affiliated with a sect, 2) does the school require students to participate in sectarian activities, and 3) does the school require education in specific sectarian courses or other curriculum activities." *Id.* French described his determination that a particular school was not eligible for the TTP because "[t]hey are affiliated with the Episcopal Church as demonstrated by their membership in the National Association of Episcopal Schools" and "[t]hey require students to participate in chapel services." *Id.* The general counsel of the AOE responded that "I agree with your basic approach and conclusions." *Id.*

2

In a 2000 letter, the legal counsel of the Department of Education—the predecessor agency to the AOE—rendered a determination as to whether a particular school was "pervasively sectarian such that it is ineligible to receive public funds." *Id.* at 372. The agency concluded that "the school is not so pervasively sectarian in nature that it should be ineligible to receive public funds." *Id.* The agency reached that conclusion because "the school, in the main, is a secular one" and "[t]here appears to be no intertwining of 'secular and sectarian aspects in its educational program.'" *Id.* (quoting *Chittenden Town*, 738 A.2d at 542). The agency noted that the school's program does not contain "mandatory religious education," the staff includes "no religious personnel," "classes and textbooks do not contain religious content," the "curriculum is exclusively secular," and members of the school's Board of Trustees "are not necessarily members of the Episcopal Church." *Id.* at 372-73. Therefore, even though "there are certain financial and other ties to the Episcopal Church," the agency determined that "the program is not a sectarian one" and that "it would be permissible to have State funds expended for placement of students at the school." *Id.* at 373.

II

If the AOE could establish that the South Hero school district implemented the TTP in this manner, the AOE's reliance on such a "pervasively sectarian" test to administer the DEP would still discriminate based on religious status in violation of the Free Exercise Clause. "The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, 'protects religious observers against unequal treatment' and against 'laws that impose special disabilities on the basis of religious status.'" *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2254 (2020) (quoting *Trinity Lutheran Church of*

3

*Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017)). The exclusion of certain types of religious institutions—pervasively sectarian schools—is discrimination on the basis of religious status. When a state conditions eligibility for public benefits "on the degree of religiosity of the institution and the extent to which that religiosity affects its operations, as defined by such things as the content of its curriculum and the religious composition of its governing board," it discriminates on the basis of religious status because it "discriminates among religious institutions on the basis of the pervasiveness or intensity of their belief." *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008).

As a plurality of the Supreme Court has explained, "the application of the 'pervasively sectarian' factor" in dispensing public benefits "collides with our decisions that have prohibited governments from discriminating in the distribution of public benefits *based upon religious status* or sincerity." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion) (emphasis added); *see also id.* at 835 n.19 (noting that the application of such a test "to require exclusion of religious schools from [a public] program would raise serious questions under the Free Exercise Clause"). The Tenth Circuit has also recognized that "[b]y giving scholarship money to students who attend sectarian—but not 'pervasively' sectarian—[schools], [a state] necessarily and explicitly discriminates among religious institutions, extending scholarships to students at some religious institutions, but not those deemed too thoroughly 'sectarian' by governmental officials. … This is discrimination 'on the basis of religious views or religious status.'" *Colo. Christian Univ.*, 534 F.3d at 1258 (footnote omitted) (quoting *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990)); *see also Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1342 (D.C.

4

Cir. 2002) ("[A]n exemption solely for 'pervasively sectarian' schools would itself raise First Amendment concerns—discriminating between kinds of religious schools.").

This sort of "status-based discrimination is subject to 'the strictest scrutiny.'" *Espinoza*, 140 S. Ct. at 2257 (quoting *Trinity Lutheran*, 137 S. Ct. at 2022). Because the AOE has not identified a compelling interest that this discrimination would serve with respect to the DEP, *see ante* at 27, it cannot survive such scrutiny.

At one time, applicable precedent indicated that the Establishment Clause required discrimination against pervasively sectarian institutions.[1] But that is not the law today: "[N]othing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs, and other doctrines of this Court bar it." *Mitchell*, 530 U.S. at 829.[2] Because the aid here

---

[1] *See Wolman v. Walter*, 433 U.S. 229, 250 (1977) (noting that "[i]n view of the impossibility of separating the secular education function from the sectarian," state aid that "inevitably flows in part in support of the religious role of the schools" is "unconstitutional"), *overruled by Mitchell*, 530 U.S. 793; *Meek v. Pittenger*, 421 U.S. 349, 365-66 (1975) ("Even though earmarked for secular purposes, 'when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission,' state aid has the impermissible primary effect of advancing religion."), *overruled by Mitchell*, 530 U.S. 793.

[2] *See also Mitchell*, 530 U.S. at 835 (plurality opinion) ("To the extent that *Meek* and *Wolman* conflict with this holding, we overrule them."); *id*. at 837 (O'Connor, J., concurring) ("To the extent our decisions in *Meek v. Pittenger* and *Wolman v. Walter* are inconsistent with the Court's judgment today, I agree that those decisions should be overruled.") (citations omitted). The Court's plurality in *Mitchell* explained that "[i]f a program offers permissible aid to the religious (including the pervasively sectarian), the areligious, and the irreligious, it is a mystery which view of religion the

follows from the independent choices of parents and students in sending districts to attend particular schools, there is even less justification for such discrimination.[3]

To be sure, a state retains some limited discretion to avoid funding certain religious uses. *See Trinity Lutheran*, 137 S. Ct. at 2022-24 (construing *Locke v. Davey*, 540 U.S. 712 (2004)); *see also infra* Part III. But the "pervasively sectarian" test that the AOE and at least one school district have employed classifies schools based on their sectarian status and discriminates on that basis. This status-based discrimination cannot be justified because it might have "the goal or effect of ensuring that government aid does not end up being used for 'sectarian education' or 'religious education.'" *Espinoza*, 140 S. Ct. at 2256. A state may not deny aid to "schools that believe faith should permeate everything they do" because it worries the aid "could be used for religious ends" by those schools. *Id.* (internal quotation marks, alteration, and emphasis omitted). The Supreme Court has

---

government has established, and thus a mystery what the constitutional violation would be. The pervasively sectarian recipient has not received any special favor," and there is no reason to "reserve special hostility for those who take their religion seriously, who think that their religion should affect the whole of their lives, or who make the mistake of being effective in transmitting their views to children." *Id.* at 827-28 (plurality opinion).

[3] *See Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) ("[W]here a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause. … The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government.").

been clear: "Status-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses." *Id.*[4]

Thus, even if the AOE could establish that the South Hero school district relied on the "adequate safeguards" framework to deny funding to Rice, the record indicates that school districts in Vermont apply this framework to exclude "pervasively sectarian" schools from otherwise available public funding. The AOE's reliance on such exclusion would still amount to unconstitutional status-based discrimination.

III

The AOE nevertheless suggests that school districts may apply the "adequate safeguards" framework to deny public funding for certain religious uses rather than on the basis of religious status. *See* Appellee's Br. 23-24. No evidence in the record supports that suggestion, though the Vermont Supreme Court's opinion in *Chittenden Town* does suggest a focus on a school's activities rather than its status. The concurring opinion in *Chittenden Town* argued that funding was impermissible when the receiving school was "a pervasively sectarian school at which religious worship regularly takes place in conjunction with educational activities." *Chittenden Town*, 738 A.2d at 564 (Johnson, J., concurring). The majority indicated, however, that the Compelled Support Clause of the Vermont Constitution would not prohibit "any subsidy for activities

---

[4] Indeed, the state program the Supreme Court upheld in *Locke* "allowed scholarships to be used at 'pervasively religious schools' that incorporated religious instruction throughout their classes." *Espinoza*, 140 S. Ct. at 2257 (quoting *Locke*, 540 U.S. at 724-25).

in or by a sectarian school, irrespective of the sectarian nature of those activities." *Id.* at 562 n.24 (majority opinion). The majority held that "safeguards" are required to "prevent the use of public money to fund religious education." *Id.* at 562. The constitutional problem with the TTP, according to the Vermont Supreme Court, is that "[s]chools to which the tuition is paid by the district can use some or most of it to fund the costs of religious education." *Id.* at 562-63.

Even assuming that the Vermont Supreme Court's distinction between religious and secular education is a use-based restriction rather than the equivalent of the "pervasively sectarian" test—and assuming that the AOE could establish that South Hero applies such a use-based restriction—that would not change the outcome in this case. The Supreme Court's decision in *Espinoza* explains that a use-based religious exclusion must be justified by "a 'historic and substantial' state interest" or "tradition." 140 S. Ct. at 2257-58 (quoting *Locke*, 540 U.S. at 725). And *Espinoza* clarifies that while there is "a 'historic and substantial' state interest in not funding the training of clergy," there is no comparable interest or tradition of states declining to aid religious education broadly:

> [N]o ... 'historic and substantial' tradition supports [a state's] decision to disqualify religious schools from government aid. In the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones. ... Local governments provided grants to private schools, including religious ones, for the education of the poor. Even States with bans on government-supported clergy ... provided various forms of aid to religious schools.

*Id.* at 2258 (internal citations omitted). Thus, an "adequate safeguards" framework that featured use-based restrictions to avoid

8

"funding religious education" in high schools, *Chittenden Town*, 738 A.2d at 562, would violate the Free Exercise Clause. Moreover, even if the denial of funding under the TTP resulted from a use-based restriction that was justified by a historic and substantial state interest, the AOE would not be able to rely on that exclusion to justify excluding A.H. from the DEP unless the same or similar interest applied with respect to that program. *See ante* at 34.

* * *

In sum, A.H. has a clear likelihood of prevailing on her claim that her exclusion from the DEP violates her First Amendment right to the free exercise of religion. She is likely to prevail if Rice was denied public funding simply because it is religious, as the court's opinion emphasizes, or if her school district applied *Chittenden Town*'s "adequate safeguards" framework in one of the ways suggested by the record or the AOE.